# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No.: 13-274 (RC) |
| | : | |
| SHANTIA HASSANSHAHI, | : | Re Document Nos.: 8, 12 |
| *also known as Shantia Hassan Shahi*, | : | |
| *also known as Shahi*, | : | |
| *also known as Shantia Haas*, | : | |
| *also known as Sean Haas*, | : | |
| | : | |
| and | : | |
| | : | |
| HASSTON, INC., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

### DENYING THE GOVERNMENT'S MOTION TO REVOKE PRETRIAL RELEASE ORDER; AND DENYING DEFENDANT'S MOTION TO STRIKE

## I. INTRODUCTION

Defendant Shantia Hassanshahi was arrested at Los Angeles International Airport on September 11, 2013, on one count of conspiracy to unlawfully export U.S. goods and technology to Iran and to defraud the United States. On September 24, 2013, a Central District of California magistrate judge denied the Government's motion for pretrial detention and ordered that Mr. Hassanshahi be released on $560,000 bond and with electronic monitoring. The Government now appeals and seeks revocation of the magistrate judge's release order. For the reasons set forth below, the Court denies the Government's motion.

## II.  BACKGROUND

Shantia Hassanshahi is a dual U.S.–Iranian citizen and owner of Hasston, Inc.  *See generally* Indictment, ECF No. 7.  According to the Government's allegations, Hasston, Inc. purchases protection relays on the U.S. market and sells them to a co-conspirator in Armenia; the co-conspirator then sells the items back to Kian Day, a company owned by Mr. Hassanshahi in Iran; and Kian Day then sells the relays to the Iranian government.  *See* Gov't's Mot. Revoke & Stay 3, ECF No. 8.  Protection relays are electromechanical devices that calculate the operating conditions on electrical circuits—a use that, at least at this time, the Government has not disputed is civilian in nature.  *See id.* at 8 n.2; *see also* Def.'s Opp'n Mot. Revoke & Stay 4, ECF No. 9.  In support of its allegations, the Government presents correspondence, spreadsheets, and other files recovered from Mr. Hassanshahi's computer.

On January 9, 2013, the Government filed a complaint outlining the above allegations against Defendants.  *See* Compl., ECF No. 1.  On that same date, Magistrate Judge Deborah A. Robinson signed off on the complaint and issued a warrant for Mr. Hassanshahi's arrest. Mr. Hassanshahi was arrested on September 11, 2013, at Los Angeles International airport, and the Department of Homeland Security confiscated both his U.S. and Iranian passports at that time.  *See* Gov't's Mot. Revoke & Stay 1–2 & n.1, ECF No. 8.  He had spent the previous several months in Iran, where he reportedly stayed with a cousin.  On September 16, 2013, he made his initial appearance in the Central District of California before Magistrate Judge Carla Woehrle.  *See id.* at 2.  At that appearance, the Government moved to have Mr. Hassanshahi detained pending trial on the theory that he presented a flight risk.  *See* 18 U.S.C. § 3142(f)(2)(A) (2012).  On September 24, 2013, Judge Woehrle denied the Government's motion and ordered that Mr. Hassanshahi be released on $560,000 bond and with electronic

monitoring. *See* Gov't's Mot. Revoke & Stay 2, ECF No. 8; Def.'s Opp'n Mot. Revoke & Stay 5, ECF No. 9.

The Government then moved in this Court for an order staying and revoking Judge Woehrle's release order. *See generally* Gov't's Mot. Revoke & Stay, ECF No. 8. After briefing on the motion was completed, Mr. Hassanshahi filed an objection and motion to strike the Government's reference in its reply brief to the infamous mobster Whitey Bulger. *See generally* Obj. & Mot. Strike, ECF No. 12.[1] Judge Emmet G. Sullivan, sitting as Acting Chief Judge, issued an order on September 26, 2013, staying the release order and requiring that Mr. Hassanshahi be brought to Washington, D.C. on or before October 7, 2013. *See* Order, ECF No. 4. Also on September 26, 2013, a grand jury indicted Mr. Hassanshahi and Hasston, Inc., charging them with conspiracy to unlawfully export U.S. goods and technology to Iran and to defraud the United States, in violation of 18 U.S.C. § 371; 50 U.S.C. § 1705; and 31 C.F.R. pt. 560. *See* Indictment, ECF No. 7.

October 7 came and went, and Mr. Hassanshahi was not transferred to D.C., apparently due to his medical condition. On October 15, 2013, the Court contacted both parties in an attempt to set up a hearing on Mr. Hassanshahi's detention—via video conference, if necessary. That day, Mr. Hassanshahi's then-attorney responded that he was still "in the process of determining whether there are facilities that are available and whether Mr. Hassanshahi's

---

[1] The disputed passage reads: "He could hide in the U.S. like most escapees, including the infamous mobster, Whitey Bulger who avoided prosecution for 16 years. Bulger spent many of his years as a fugitive living in Santa Monica, California, the very state the defendant calls home." Gov't's Resp. Supp. Mot. Revoke & Stay 2, ECF No. 11. While the reference is silly and perhaps even extreme, the Government did not directly compare Mr. Hassanshahi's character to Whitey Bulger, citing the case only to show that individuals have successfully fled within the United States. Nonetheless, the reference seems inapt, as Whitey Bulger was a mobster who was aided by a corrupt officer, and Mr. Hassanshahi has no criminal record. But an inapt reference is not defamatory and does not justify striking the record. The Court will therefore deny the motion to strike.

medical condition would permit him to participate in th[at] fashion." The Court heard nothing further until October 25, 2013, when Mr. Hassanshahi's new local counsel phoned the Court to indicate that a motion for hearing would be forthcoming. On the evening of October 30, 2013, Mr. Hassanshahi filed his motion for hearing, which the Court granted. *See* Mot. Hr'g, ECF No. 18; Min. Order, Nov. 1, 2013. On November 4, 2013, the Court held oral argument on the Government's appeal and allowed Mr. Hassanshahi to appear via video conference from Los Angeles with his California counsel, who has not yet entered an appearance in this case. At the detention hearing, Mr. Hassanshahi was also arraigned on the charges in the Indictment.

### III. ANALYSIS

The Government seeks review of Judge Woehrle's release order pursuant to the Bail Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837 (codified as amended at 18 U.S.C. §§ 3141–50, 3062 (2012)). Under that Act, the Government may seek review of a magistrate judge's release order by filing, "with the court having original jurisdiction over the offense, a motion for revocation of the order . . . ." 18 U.S.C. § 3145(a)(1) (2012). Authority to review the release order lies with the district judge. *See, e.g.*, *United States v. Cisneros*, 328 F.3d 610, 615–16 (10th Cir. 2003) (citing *United States v. Johnson*, 858 F. Supp. 119, 122 (N.D. Ind. 1994)) (holding that only a district judge in the charging district, and not a magistrate judge in that district, may review the release order of a magistrate judge in the arresting district). This District Court reviews a magistrate judge's release order *de novo*. *See, e.g.*, *United States v. Beauchamp-Perez*, 822 F. Supp. 2d 7, 9 (D.D.C. 2011) (citing *United States v. Hudspeth*, 143 F. Supp. 2d 32, 35–36 (D.D.C. 2001)).

"Our system of criminal justice embraces a strong presumption against detention." *United States v. Hanson*, 613 F. Supp. 2d 85, 87 (D.D.C. 2009). "In our society liberty is the

norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).[2] The Bail Reform Act requires that the Court release a defendant if there are release conditions that reasonably assure that the individual will not present a flight risk or a danger to the community. *See* 18 U.S.C. § 3142(b) (2012). The converse is also true: The Court is prohibited from releasing a defendant if the Court finds that no condition or combination of conditions will reasonably assure the defendant's appearance in court or the safety of any other person or the community. *See id.* § 3142(e)(1). "[W]hen the government seeks pretrial detention of an individual on the ground that he poses a risk of flight, the standard it must satisfy is a 'preponderance of the evidence.'" *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996) (per curiam) (quoting *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987)). Where detention is based on an individual's danger to other people or the community, a clear and convincing standard applies. *See United States v. Hanson*, 613 F. Supp. 2d 85, 88 (D.D.C. 2009).

Here, the Government moves to revoke the release order on the basis that Mr. Hassanshahi poses a flight risk. In determining whether there are conditions of release that will reasonably assure that Mr. Hassanshahi does not pose a flight risk, the Court must consider:

(1) the nature and circumstances of the offense charged;

(2) the weight of the evidence against Mr. Hassanshahi;

(3) Mr. Hassanshahi's history and characteristics; and

(4) the nature and seriousness of the danger to other people or the community that would be posed by Mr. Hassanshahi's release.

*See* 18 U.S.C. § 3142(g).

---

[2] For certain charges, there is a rebuttable presumption that no condition or combination of conditions will reasonably assure the defendant's appearance or the safety of the community. *See* 18 U.S.C. § 3142(e)(3) (2012). However, the listed charges do not apply to this case.

5

### A. Nature and Circumstances of the Offense

In evaluating the nature and circumstances of the offense charged, the judges of this District have considered the seriousness of the offense charged, including whether the alleged crime involves violence. *See, e.g.*, *United States v. Richards*, 783 F. Supp. 2d 99, 102 (D.D.C. 2011). The statute also requires the Court to consider whether the alleged offense involves sex trafficking of children; crimes of terrorism; a minor victim; or a controlled substance, firearm, explosive, or destructive device. *See* 18 U.S.C. § 3142(g)(1). Mr. Hassanshahi argues that this case involves articles that were to be used in the civilian power grid—not the exportation of military or nuclear items—and asserts that the Government conceded as much at the hearing in Los Angeles, *see* Def.'s Opp'n Mot. Revoke & Stay 4, ECF No. 9. The Government takes no position on this in the written record.[3]

To be sure, violation of our economic sanctions against Iran is a serious offense and undermines the objectives of American foreign policy. However, the underlying crime is not a crime of violence, nor does it involve any of the other factors set forth in section 3142(g)(1). Other defendants charged with violation of economic sanctions laws have been released with electronic monitoring by judges in this district. *See, e.g.*, *Hanson*, 613 F. Supp. 2d at 91; *United States v. Karni*, 298 F. Supp. 2d 129, 132–33 (D.D.C. 2004). The facts of this case also do not suggest that Mr. Hassanshahi engaged in any violence, or threats of violence, in the course of his alleged transactions. Importantly, the Government does not assert that the exportation of the protection relays involved in this case could be used to present a physical threat to any nation or individual. Rather, as described by Mr. Hassanshahi, the protection relays serve a civilian

---

[3] The Government's discussion of this factor does not focus on the underlying charges, but rather the alleged pervasiveness of Mr. Hassanshahi's behavior. *See* Gov't's Mot. Revoke & Stay 6–8, ECF No. 8. The Court will address this argument in its discussion of Factors 2 and 3.

purpose, not a military one. *See id.* The Court therefore finds that Factor 1 favors Mr. Hassanshahi's release.

### B. Weight of the Evidence

For Factor 2, courts consider the weight of the evidence against the individual. The Government relies largely on emails and documents recovered from Mr. Hassanshahi's laptop and an affidavit submitted with the Government's complaint. *See generally* Akronowitz Aff., ECF No. 1-1. The Government asserts that these documents show repeated, continuous, and pervasive criminal activity, but Mr. Hassanshahi argues that much of the evidence is cumulative, referring to the same transaction over time. *Compare* Gov't's Mot. Revoke & Stay 9–10, ECF No. 8, *with* Def.'s Opp'n Mot. Revoke & Stay 5, ECF No. 9.

The weight of the evidence is difficult to assess at this stage of the case. In the record is a four-page spreadsheet, which the Government asserts shows 12 separate transactions related to the alleged conspiracy. *See* Gov't's Mot. Revoke & Stay 7–8 & Attach. E, ECF Nos. 8, 8-5. Mr. Hassanshahi characterizes the spreadsheet as a projection of the profit on a *single* alleged transaction, called the Himafan transaction. *See* Def.'s Opp'n Mot. Revoke & Stay 4, ECF No. 9. Lacking the appropriate context, it is difficult for the Court to determine who is correct from the face of the document alone.

The Government also points to a September 5, 2011, letter to Iran's Minister of Energy, which bears Mr. Hassanshahi's name and was recovered from his personal laptop computer. The letter refers to an apparent transaction in which the Iranian Ministry of Energy procured protection relays for a regional electric company via Hasston, Inc. *See* Akronowitz Aff. 10–11, ECF No. 1-1. The Government places particular emphasis on the following paragraph:

> Considering the above, the losses and damages, my unfulfilled obligations to COMPANY A, I am left in a situation where it is feared that the manufacturer

> may bring a lawsuit against me in American courts for failure to act under
> obligations. And given that I am an Iranian and that these items are subject to
> sanctions and the fakeness of the end user, the worst will be expected.

*Id.* at 11. Mr. Hassanshahi argues that there is no evidence that the letter was ever actually signed or sent. *See* Def.'s Opp'n Mot. Revoke & Stay 4, ECF No. 9. While he is correct that there is no such evidence before the Court, it is the admissions contained in the letter—and not the act of signing and sending it—that would be probative in the underlying case at hand. Although Mr. Hassanshahi argues that there is also no evidence that he wrote the letter, he has not affirmatively argued that other individuals had access to his laptop. The fact that the document was recovered from his laptop and bears his name constitutes circumstantial evidence that he is the author. The weight of the evidence thus favors detention.

### C. The Defendant's History and Characteristics

A defendant's history and characteristics encompass many aspects of the individual's life and background. In evaluating this factor, courts have emphasized the defendant's criminal background, and particularly whether he has been charged with or convicted of the same offense before. *See, e.g.*, *Richards*, 783 F. Supp. 2d at 103. D.C. Circuit case law provides further guidance, indicating that courts should consider certain personal factors related to the defendant's background, including his education, assets, employment, family, and other personal ties to the United States and the jurisdiction specifically (here, Washington and Los Angeles). *See United States v. Nwokoro*, 651 F.3d 108, 110–11 (D.C. Cir. 2011) (per curiam). These factors are also identified in the statute. *See* 18 U.S.C. § 3142(g)(3)(A).

Mr. Hassanshahi asserts that he "has no criminal record whatsoever[,]" Def.'s Obj. & Mot. Strike, ECF No. 12, and the Government does not dispute that fact. His family ties to the Los Angeles area are very strong, including siblings, elderly parents, his ex-wife, his eighteen-year-old daughter, and other relatives, who have submitted the $560,000 in bond securities on his

behalf. *See* Def.'s Opp'n Mot. Revoke & Stay 3, ECF No. 9. He has extended family in Iran, including a cousin who hosted Mr. Hassanshahi during his most recent trip there. However, the Court is not aware of any immediate family members in Iran. According to statements provided at oral argument, Mr. Hassanshahi was also educated in the United States.

The Government contends that Mr. Hassanshahi's U.S. family members could visit him in Iran or assist him in fleeing, but the contention appears to be purely speculative at this point. *See* Gov't's Reply Supp. Mot. Revoke & Stay 3, ECF No. 11. According to statements made at oral argument, his family has been in the United States for several decades. Moreover, where the defendant is a dual citizen and dual passport-holder, the D.C. Circuit has considered it relevant that his passports have been confiscated. In *Nwokoro*, the defendant held both U.S. and Nigerian passports, but the D.C. Circuit found it relevant that the documents were in government custody. *See Nwokoro*, 651 F.3d at 110 & n.2. Similarly, both of Mr. Hassanshahi's passports have been confiscated. *See* Gov't's Mot. Revoke & Stay 1 n.1, ECF No. 8. By comparison to *Nwokoro*, however, it is noteworthy that Nigeria has an embassy in the United States and Iran does not. Even according to the Government's own argument, Mr. Hassanshahi would first have to cross into Canada or Mexico to reach an Iranian embassy and obtain a new passport, *see id.* at 2; the same was not true of Mr. Nwokoro, whose detention order was remanded by the D.C. Circuit for failure to consider all relevant facts. *See Nwokoro*, 651 F.3d at 111–12.

Although not extensively discussed in the briefing, the Court is also compelled to give weight to Mr. Hassanshahi's medical condition. According to a doctor's note entered in the public record, Mr. Hassanshahi suffers from a prostatic disease, *see* Mot. Hr'g Ex. 2, ECF No. 18-2, a condition which has apparently prevented his transfer to this District as required by Judge Sullivan's order, *see* Order, ECF No. 4. If it is not medically advisable for

9

Mr. Hassanshahi to travel from Los Angeles to D.C., it is likely not in his medical interest to flee from Los Angeles to Iran either—particularly where, as here, such travel would require the intermediate step of reaching an Iranian embassy outside of the United States in order to obtain a new passport.

The Government also argues that Mr. Hassanshahi's alleged *knowing* violation of economic sanctions laws, as evidenced by the letter to Iran's Minister of Energy acknowledging that the protection relays are subject to sanctions, indicates that he cannot be trusted. *See* Gov't's Mot. Revoke & Stay 9–10, ECF No. 8. But assuming that Mr. Hassanshahi did draft the letter, this evidence of untrustworthiness does not outweigh his extensive personal connections to the United States and, specifically, Los Angeles. The Government also takes issue with Mr. Hassanshahi's purported statement, in the same letter, that "given I am an Iranian . . . the worst will be expected." *See* Akronowitz Aff. 11, ECF No. 1-1. The Government argues that this statement shows Mr. Hassanshahi's disloyalty to the United States. *See* Gov't's Mot. Revoke & Stay 9–10, ECF No. 8. While the sentence can certainly be read in such a way that indicates that Mr. Hassanshahi identifies as Iranian first, it may also be more benign—for example, referring to the fact that his dual citizenship could raise a higher suspicion that he is engaged in economic sanctions violations.

There is also no strong evidence that Mr. Hassanshahi has an intent[4] or incentive to flee. While the prospect of serving a long prison sentence may provide an incentive to flee, not every defendant convicted of violating economic sanctions laws is sentenced to a long term of

---

[4] The record shows that Mr. Hassanshahi booked a return ticket to Iran for January 2014. *See* Gov't's Mot. Revoke & Stay Attach. G, ECF No. 8-7. Mr. Hassanshahi asserts that the ticket does not reflect any intent to flee, but rather indicates that it is cheaper to book a round-trip flight originating in Iran instead of a round-trip flight originating in Los Angeles. *See* Def.'s Addition Opp'n Mot. Revoke & Stay, ECF No. 10. The Court therefore does not find the booked return flight to be particularly probative of any intent to flee.

incarceration.  In certain circumstances, judges in this District have sentenced non-cooperating defendants dealing in civilian-use articles to less than two years in prison.  *See, e.g.*, Judgment, *United States v. Habibion*, No. 11-cr-00118-ESH (D.D.C. May 23, 2012), ECF No. 119 (13 months); Judgment, *United States v. Shih*, No. 11-cr-00119-JEB (D.D.C. Feb. 22, 2012), ECF No. 53 (18 months).  Mr. Hassanshahi's immediate family ties to the United States provide a strong countervailing disincentive to flee.  Such an action would likely render Mr. Hassanshahi unable ever to return to the United States, causing him to miss important family events and milestones, such as his daughter's wedding and elderly parents' burial.

In economic sanctions cases, other judges in this District have authorized pretrial release under electronic monitoring for defendants whose incentives to flee were substantially greater than those of Mr. Hassanshahi.  In *Hanson*, the court authorized such pretrial release for a defendant who had strong business interests, family connections, and property tied to China; whose marriage was faltering, severing her main personal connection to the United States; and who, during the previous 10 years, had spent almost all of her time living abroad.  *See Hanson*, 613 F. Supp. 2d at 89.  In *Karni*, the court authorized such conditions for an Israeli national who had resided and owned property in Cape Town, South Africa for the previous 18 years, and whose family was still located there.  *See Karni*, 298 F. Supp. 2d at 132.  Despite the "absence of connections tying Mr. Karni to this country," the court released him under electronic monitoring to reside in a sheltering home in Silver Spring, Maryland.  *Id.*  In both cases, the defendants' ties to the United States were far weaker than Mr. Hassanshahi's.

In total, the components of Factor 3 favor Mr. Hassanshahi's release and suggest that he does not pose a flight risk.

### D. Danger to Others

The Government does not contend that Mr. Hassanshahi poses a risk of danger, and thus does not address Factor 4. *See* Gov't's Mot. Revoke & Stay 6 n.3, ECF No. 8. Nonetheless, the Bail Reform Act mandates that a court "shall" consider all four factors. *See* 18 U.S.C. § 3142(g). Because the Government presents no evidence or argument regarding this factor; the alleged crime does not appear to involve violence, threat of violence, or dual- or military-use articles; and Mr. Hassanshahi does not appear to have a background of violence, this factor favors release. However, because the main issue on appeal is Mr. Hassanshahi's flight risk, the Court does not give Factor 4 much weight.

### IV. CONCLUSION

It is the Government's burden to show, by a preponderance of the evidence, that no set of pretrial release conditions will reasonably ensure Mr. Hassanshahi's appearance. *See* 18 U.S.C. § 3142(e)(1) (2012); *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996) (per curiam). It is true, as the Government points out, that electronic monitoring is not foolproof and that it is possible that Mr. Hassanshahi could overcome several significant obstacles to get to Iran. But those general arguments are speculative and do not focus on this defendant. The law only requires release conditions that will *reasonably* ensure a defendant's appearance, not foolproof conditions. An overall balancing of the factors favors Mr. Hassanshahi's release with conditions. His alleged crime does not involve any act or threat of violence, and the Government does not contend that he is a danger to any member of the community. The Government appears to have amassed significant documentary evidence against Mr. Hassanshahi as to at least one illegal transaction. However, Mr. Hassanshahi's medical condition and extensive personal ties to the Los Angeles area suggest that reasonable conditions of release will ensure his appearance. For

these reasons, the Court will deny the Government's motion to revoke the release order, but will modify the conditions of release. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:   November 5, 2013                                                   */s/ Rudolph Contreras*
                                                                                                         RUDOLPH CONTRERAS
                                                                                                         United States District Judge