UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No.: 13-274 (RC) |
| | : | |
| SHANTIA HASSANSHAHI, | : | |
|     aka SHANTIA HASSAN SHAHI, | : | |
|     aka SHAH, | : | |
|     aka SHANTIA HAAS, | : | |
|     aka SEAN HAAS, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this memorandum to aid the Court in its sentencing decision. On September 14, 2016, the defendant pleaded guilty to Conspiracy to Unlawfully Export Goods, Technology, and Services to Iran without the required license from the Office of Foreign Assets Control ("OFAC"), and to Defraud the United States, in violation of 18 U.S.C. § 371. Paragraph 91 of the Presentence Report properly notes that although the applicable sentencing guideline range is 46 to 57 months of incarceration, the government has agreed that it will not seek a sentence of more than 36 months' imprisonment. Indeed, the government requests that the Court impose a sentence of 36 months' incarceration.

### I. FACTUAL BACKGROUND

Defendant Shantia Hassanshahi ("Hassanshahi" or the "defendant") is a dual citizen of the United States and Iran, having been born in the latter country. In March 2009, he formed a

company called Hasston, Inc. ("Hasston"), in California.  Hassanshahi was the President, and as far as the government can determine, the sole employee, of Hasston.[1]

The defendant and several coconspirators then developed a scheme in which Hassanshahi, through Hasston, would purchase protection relays[2] from a Canadian manufacturer and have them shipped to Iran, in violation of U.S. export laws.  In a nutshell, the scheme worked as follows:  Hassanshahi and Hasston placed orders for protection relays with Areva T&D ("Areva"), the Canadian company that manufactured them.[3]  The purchase orders stated that the protection relays should be sent to Hasston in California.  Hassanshahi also provided false end user statements to Areva, which claimed, for example, that the protection relays would be used in the Kurdistan Region of Iraq.  Hassanshahi then directed the shipping company to send the protection relays either to Iraq or Armenia, knowing they would be picked up by his coconspirators, who would then smuggle the goods into Iran.

Hassanshahi knew that the protection relays were intended for purchase and use by an Iranian company.  In fact, one of the documents recovered from the border search of the defendant's laptop computer[4] was a "Memorandum of Understanding and Cooperation" between

---

[1] The government has obtained Hasston's Articles of Incorporation from the State of California.  (See Exhibit 1.)  The Articles list Hassanshahi as Hasston's Incorporator, as well as the Chief Executive Officer, Secretary, Chief Financial Officer and sole Director.  Hasston's business address was the same as Hassanshahi's home address at that time.

[2] Protection relays are electromechanical devices that are designed to trip a circuit breaker when a problem, or fault, is detected in an electrical power grid.

[3] Areva has been purchased by another company, and is now known as Schneider Electric.  However, for purposes of this memorandum, we will refer to the company as "Areva."

[4] The defendant's laptop was seized on January 12, 2012, during a border search of the defendant that occurred when he flew into the Los Angeles International Airport after an overseas trip.

the defendant and an Iranian company. (See Exhibit 2.) That document, dated December 31, 2009, memorialized the defendant's ongoing scheme, which began earlier in 2009, by putting into writing the defendant's responsibility for ordering the protection relays from Areva and delivering them to Armenia. The Iranian company was responsible for paying Hassanshahi (with funds received from yet another Iranian company) so that Hassanshahi could use those funds to pay Areva.

This conspiratorial arrangement between the defendant and his coconspirators worked successfully on a number of occasions and the defendant was able to illegally export numerous protection relays to Iran. And the defendant was able to make payments to Areva for a number of shipments. However, the arrangement eventually ran into difficulties, resulting in Hassanshahi's inability to make timely payments to Areva for the protection relays he was ordering. Despite those difficulties, there is no doubt that Hassanshahi was successful in committing the crime for which he has been convicted: ***conspiring*** to export protection relays to Iran, without the required federal license from OFAC.

## II. SENTENCING RECOMMENDATION

In determining the appropriate sentence, the Court must consider a number of factors outlined in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense, the history and characteristics of the defendant, the need to promote respect for the law and deter the defendant from committing new crimes, the need to protect the public and provide just punishment, and the sentencing range established by the U.S. Sentencing Guidelines ("Guidelines"). Consideration of these and other sentencing factors suggests that a sentence of 36 months' incarceration is fair and appropriate.

A. **The nature and circumstances of the offense**.

A violation of the laws prohibiting certain transactions with Iran is a significant criminal offense because, as President Bill Clinton declared in an Executive Order issued on March 15, 1995, those sanctions were implemented to combat the "unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" caused by the Government of Iran. Exec. Order No. 12,957, 60 Fed. Reg. 14,615 (Mar. 17, 1995). Even though the sanctions against Iran have recently been relaxed to some extent, President Barack Obama reaffirmed the importance of the sanctions against Iran, stating: "[d]espite the historic deal to ensure the exclusively peaceful nature of Iran's nuclear program, certain actions and policies of the Government of Iran continue to pose an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. For this reason, the national emergency declared on March 15, 1995, must continue in effect beyond March 15, 2016." 81 Fed. Reg. 12,791; 12,793 (Mar. 10, 2016). In other words, violating the sanctions laws constitutes a serious criminal offense because those laws help protect the national security and economy of this country, and effect our foreign policy with Iran.

In this case, the defendant's own admissions demonstrate that he knew the protection relays he was purchasing on Iran's behalf would be used to benefit Iran's energy grid. In a letter addressed to the Iranian Minister of Energy, dated September 19, 2011, the defendant wrote, in part: "you are respectfully informed that Fars Regional Electric Company called for bids for the purchase of protective relays." (See Exhibit 3.)[5] The protection relays were being purchased by the Fars Regional Electric Company in Iran, and thus had significant value in ensuring the safety

---

[5] In a Memorandum Opinion, filed on June 24, 2016 (ECF Doc. No. 118), the Court ruled that this letter would be admissible at trial.

of Iran's power grid.  Hassanshahi's efforts to provide the protection relays was a significant violation of U.S. laws aimed at preventing that type of assistance to Iran.

Moreover, Hassanshahi was doing business with Iran, without a license, and in violation of U.S. sanctions laws despite knowing that it was illegal to do so.  In our Motion and Notice of Intention to Introduce Evidence of Prior Bad Acts (ECF Doc. No. 94), the government described evidence of the defendant's earlier efforts to transact business in Iran by partnering with a Chinese company to manufacture computers in Iran.  When the partnership with the Chinese company fell through, the defendant and his partners sued in a California state court to enforce their agreement to build computers in Iran.  The California court ruled against Hassanshahi and his partners because their attempt to provide goods and technology to Iran, in the form of computers, violated the very same U.S. sanctions laws at issue in this case.  This Court ruled that evidence of the circumstances described above would be admissible at trial because "the events provide probative evidence that Mr. Hassanshahi had already been informed that he could not export goods to Iran without the required license."  Memorandum Opinion, ECF Doc. No. 118, p. 15.

In short, Hassanshahi's knowing and deliberate conduct in this case is all the more egregious because he had been informed, as a result of the California court decision, that his conduct was illegal.  And, yet, Hassanshahi decided to ignore the law in an attempt to make money for himself.  The nature of the criminal violation and the circumstances surrounding the defendant's conduct calls for a significant sentence of incarceration.

**B.  <u>The history and characteristics of the defendant.</u>**

The defendant is a well-educated engineer and businessman with no criminal history.  That much is in his favor.

What is very troubling, however, is the degree of deceit he used to commit this crime. The defendant knew that he was engaging in an illegal endeavor, and so he had to lie to accomplish his crime. For example, Hassanshahi and his coconspirators created at least one false end user statement to give to Areva so that company would believe the products would end up in Iraq (an acceptable country) rather than Iran (a sanctioned country). (See Exhibit 4). Then Hassanshahi apparently created and sent a letter (using the name of a coconspirator) to the airline transporting the protection relays that enabled one of the coconspirators to pick up the goods in Iraq so that he could then smuggle them to Iran. (See Exhibit 5.)

Indeed, when Hassanshahi implored the Iranian Minister of Energy to help him obtain the funds to pay Areva for the protection relays he worried that his deceit would be exposed if he failed to pay Areva quickly. In the letter to the Minister of Energy, Hassanshahi wrote: "It should be mentioned that I have to pay the entire amount that I owe to the manufacturer by October 2011 (That is, in less than 20 days.) If Areva is not paid by the said date, that company will probably begin to look into the address and information of the fake user in the Central Asian countries. This would mean giving away the diverted itineraries of the *High Tech* goods to our country!" (See Exhibit 3.)

Furthermore, the defendant's words and actions clearly expressed a preference for the country of his birth, Iran, over the United States, the country where he lives. Hassanshahi pleaded with the Minister of Energy to assist him in obtaining funds to pay Areva in order to avoid being sued for failure to make the payments. In his letter, Hassanshahi wrote: "I ask you to note that my unfulfilled obligations toward Areva puts me in a critical and worrisome situation where it is feared that the manufacturer may bring a lawsuit against me in American courts for breach of agreement. Since I am an Iranian and that these *High Tech* items are subject to

sanctions and that the address and information of the end user is fake, the worst legal problems will be expected." (See Exhibit 3.)[6]

The defendant's lack of loyalty to his adopted country, the United States, a country whose citizenship he claims, further demonstrates his deceitfulness in this matter.

### C. The need to promote respect for the law and deter the defendant from committing new crimes, and the need to protect the public and provide just punishment.

In order to promote respect for the law – both by the defendant and the public – it is necessary and appropriate to impose a meaningful sentence of 36 months' incarceration. In his letter to the Minister of Energy, the defendant admitted that he knew about the U.S. sanctions against Iran and that he was violating them. His knowledge about the sanctions is no surprise, especially in light of the California lawsuit that clearly informed him that he had almost violated the U.S. sanctions against Iran by manufacturing computers in that country. Hassanshahi should not be permitted to flout U.S. sanctions laws now, with a slap on the wrist, in the form of an overly lenient sentence.

Furthermore, Hassanshahi has demonstrated his willingness to repeat illegal behavior by engaging in this conspiracy years after the warning he received from the California court. His repeated disregard for the sanctions laws of the United States demands a sentence that will help protect this country from any new illegal schemes he might concoct that would violate U.S. sanctions laws for the benefit of Iran. An inappropriately lenient sentence would send the wrong

---

[6] The defendant's fear of a lawsuit was justified. As discussed below, in Section II(E) of this memorandum, Hasston was eventually sued for failing to pay for all of the protection relays it exported to Iran.

message and convince others who believe the financial rewards of doing illegal business with Iran is worth the risk of getting caught and facing a minor penalty.

### D. The sentencing range established by the U.S. Sentencing Guidelines.

The Probation Office has determined that the applicable guideline imprisonment range is 46-57 months. The government agrees that is the correct calculation under the guidelines.

However, pursuant to the written plea agreement in this case, the government agreed that it would recommend that the Court impose a sentence of no more than 36 months' incarceration. Now, based upon the defendant's conduct in this case, the government recommends that the Court impose a sentence of 36 months' incarceration.

This sentence is in line with several sentences recently imposed in export cases similar to this one. For example, on May 23, 2016, in *U.S. v. Ali Reza Parsa*, Cr. No. 14-710, in the Southern District of New York, the Court sentenced Parsa to three years' in prison for his participation in a conspiracy to violate the International Emergency Economic Powers Act ("IEEPA") and the Iranian Transactions and Sanctions Regulations. Between approximately 2009 and 2015, Parsa (a Canadian-Iranian dual citizen) conspired to obtain high-tech electronic components from U.S. companies for transshipment to Iran, without the required license from the U.S. government.

In *U.S. v. Arash Ghahreman*, Cr. No. 13-04228, on August 27, 2015, in the Southern District of California, Ghahreman was sentenced to 78 months in prison after his conviction by a jury for violating export and money laundering laws. Ghahreman was found guilty of conspiring to attempt to export marine navigation equipment and military electronic equipment for end-use in Iran.

In *U.S. v. Nicholas Kaiga*, Cr. No. 13-531, on March 4, 2015, in the Northern District of Illinois, the Court sentenced Kaiga to 27 months' imprisonment after he pled guilty to attempting to violate IEEPA. Kaiga admitted that he attempted to export aluminum tubes that were controlled for nuclear nonproliferation purposes from a company in the U.S., through Belgium, to a company in Kuala Lumpur, Malaysia, without obtaining a license from the U.S. Commerce Department.

While this sample of cases is certainly not exhaustive, it should help demonstrate to the Court that the government's recommendation that the defendant receive a 36 month sentence of incarceration is reasonable and appropriate in light of the circumstances of this case.

### E. Restitution.

Near the conclusion of the defendant's plea hearing, the Court asked government counsel whether the government believed that restitution would be an issue in this case. The undersigned responded that the government did not believe restitution should be an issue. At that time, the government had not considered Areva to be a victim in this matter.

However, the government has reconsidered the issue of restitution, and now believes that awarding restitution to Areva is appropriate. If the Court determines that Areva is a victim of the offense, the government believes that the defendant should be ordered to pay $300,000 in restitution to Areva.

Mandatory restitution must be awarded to the "victim of the offense," as required by 18 U.S.C. § 3663A(a)(1). Under the statute, a "victim" means "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including . . .any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). In this case, the defendant pleaded

guilty to a conspiracy to export protection relays to Iran, without a federal license to do so. Therefore, the United States government is a victim of that offense because federal sanctions laws were violated by the defendant's illegal and fraudulent behavior.

But Areva is also a victim. The defendant purchased numerous protection relays from Areva during the course of his conspiracy, but failed to pay for all of them. Areva suffered directly and proximately because the defendant obtained protection relays that he did not pay for. Areva would not have suffered those losses but for the defendant's illegal conduct, which is the same conduct he admitted by pleading guilty. [7]

---

[7] Hassanshahi argues that he should not be held personally responsible for making restitution payments because his company, Hasston, was the entity that actually ordered the protection relays and therefore only Hasston can be held responsible for any non-payment and any restitution. Hassanshahi also argues that since charges will be dismissed against Hasston, as part of the plea agreement, the company cannot be ordered to pay restitution.

The government disagrees. The principles of piercing the corporate veil make it appropriate to order Hassanshahi to pay restitution if the Court decides that Areva is a victim of his crimes.

The case of *Labadie Coal Co. v. Black*, 672 F.2d 92 (D.C. Cir. 1982), is instructive in determining whether to pierce the corporate veil. That case posed a two prong test: first, "is there such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist?", and second, "if the acts are treated as those of the corporation alone, will an inequitable result follow?" *Id*. at 96.; see also *Flynn v. Thibodeaux Masonry, Inc*., 311 F.Supp.2d 30, 41 (D.D.C. 2004).

Here, consideration of the first prong of the test weighs in favor of finding that Hassanshahi and Hasston were one in the same. When Hassanshahi incorporated Hasston, he held every position in the company. There is no indication that Hassanshahi engaged in the formalities of corporate management, such as maintaining corporate minutes or issuing stock, and Hassanshahi used his home address as the business address for Hasston. With respect to the second prong, it would be unfair – in these criminal proceedings -- to permit Hassanshahi to hide behind Hasston because there is no real distinction between Hassanshahi and his company. "[A] corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons." *Capital Telephone Company, Inc. v. F.C.C., 498 F.2d 734, 738 (D.C. Cir. 1974)*. Piercing Hasston's corporate veil will prevent Hassanshahi from shielding his fraudulent, criminal behavior from an

Courts have routinely ruled that persons and entities injured as a result of criminal conduct and conspiracies are "victims" eligible for restitution because they were directly and proximately harmed during the offense. See, *e.g.*, *U.S. v. Brock-Davis*, 504 F.3d 991 (9th Cir. 2007) (motel owner who had to pay to clean up a meth lab created by defendant in his motel was a victim entitled to restitution for clean-up costs); *U.S. v. Hensley*, 91 F.3d 274 (1st Cir. 1996) (defendant properly ordered to pay restitution to a victim not named in the indictment because victim was harmed during the course of conspiracy for which defendant was convicted); *U.S. v. Obasohan*, 73 F.3d 309 (11th Cir. 1996) (defendant ordered to pay restitution for all credit card losses resulting from the conspiracy); *U.S. v. Pepper*, 51 F.3d 469 (5th Cir. 1995) (restitution ordered for victims not named in the indictment because they were harmed during the defendant's fraudulent scheme); *U.S. v. Dodd*, 978 F.Supp.2d 404 (M.D. Pa. 2013) (court determined that contractors on a federal construction project, who weren't paid by the owner of the project, were victims entitled to restitution). Similarly, Areva is a victim within the meaning of the statute because it suffered losses as a result of the defendant's conspiracy to purchase protection relays and export them to Iran. Put another way, Areva would not have suffered losses but for Hassanshahi's failure to pay for the protection relays he ordered and received.

Areva has submitted an "Affidavit of Anouk LeClerc" ("Affidavit") that describes the loss it suffered as a result of the defendant's non-payment. (See Exhibit 6.) That Affidavit explains that the defendant failed to make full payment on seven orders for protection relays. In

---

appropriate criminal sanction, which, in this case, should include an award of restitution to Areva.

fact, as the Affidavit explains, Areva obtained a civil judgment against Hasston for the failure to pay for protection relays in the total amount of $481,030.92, which includes prejudgment interest, costs and attorney's fees. Of that total amount, the principal sum for the protection relays is $358,544.17.

As the defendant pointed out in his objections to the pretrial report, some of that principal amount undoubtedly includes some profit to Areva for the sale of the protection relays. Accordingly, we seek restitution in the amount of $300,000, a figure that would more accurately reflect the cost of the protection relays, minus a profit margin. We believe this amount is fair and just because it is a figure the defendant himself used in describing the amount of money he owed Areva for protection relays he had received, but failed to pay for. In his letter to the Iranian Minister of Energy, Hassanshahi said that he was unable to "pay the remaining $300,000 to the manufacturer." (See Exhibit 3.) In short, the defendant admitted that he owed at least $300,000 to Areva, and that is the amount of restitution we request that he pay.

The government urges the Court to impose a sentence upon the defendant that reflects the seriousness of his criminal conduct and which discourages him, and others, from engaging in similar conduct in the future. We believe that an order requiring restitution, and a sentence of 36 months' imprisonment, is fair and appropriate punishment for the defendant.

                        Respectfully submitted,

                        CHANNING D. PHILLIPS
                        United States Attorney

By: _____/s/_____
        Frederick W. Yette, DC Bar #385391
        Assistant United States Attorney
        555 4th Street, N.W., Room 11-443
        Washington, D.C. 20530
        Frederick.Yette@usdoj.gov